# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JERRY P., | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-6917 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| ANDREW M. SAUL, Commissioner of the | ) | |
| Social Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER[2]

Plaintiff Jerry P.[3] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* Plaintiff has filed a motion for summary judgment [dkt. 20]; the Commissioner has filed a cross-motion for summary judgment [dkt. 27]. For the reasons detailed below, Plaintiff's motion for summary judgment [dkt. 20] is granted, and the Commissioner's motion [dkt. 27] is denied. This matter is remanded for further proceedings consistent with this Memorandum Opinion and Order.

---

[1]    As of June 4, 2019, Andrew M. Saul is the Commissioner of the Social Security Administration. Pursuant to Federal Rule Civil Procedure 25(d), he is hereby substituted as Defendant.

[2]    This Amended Memorandum Opinion and Order is issued as a result of Defendant's Rule 59(e) Motion to Alter or Amend Judgment [32], which the Court granted in part concurrently with the issuance of the instant ruling. The Commissioner urged the Court to remove all references to *McKinnie v. Barnhart*, 368 F.3d 907 (7th Cir. 2004) and *Brown v. Berryhill*, 2017 WL 5473466 (N.D. Ill. 2017) as abrogated by *Biestek v. Berryhill*, 139 S.Ct. 1148 (2019). While the Supreme Court in *Biestek* did decline to institute a categorical rule that an expert's underlying data always be available for inspection, (thus abrogating that principle of both *McKinnie* and *Brown*), it did not abrogate the entire holdings of those cases, and thus we decline to remove every reference to *McKinnie* or *Brown* from the instant opinion. Our holding does not change.

[3]    In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

## I.    BACKGROUND

### a.   Procedural History

In July 2016, Plaintiff applied for DIB and SSI, alleging disability beginning November 15, 2014. [Administrative Record ("R.") 17.] After his applications were initially denied on November 22, 2016, and upon reconsideration on January 20, 2017 [R. 91, 113, 120-29], Plaintiff requested an administrative hearing. [R. 18, 132-34.] On March 13, 2018, Plaintiff appeared with counsel and testified at a hearing before Administrative Law Judge ("ALJ") Luke Woltering. [R. 38-72.] The ALJ also heard testimony from vocational expert ("VE") Kari Seaver. *Id*. Following the March 2018 hearing, on April 23, 2018, Plaintiff's counsel penned a post-hearing memorandum of law in support of Plaintiff's claim for disability benefits. [R. 277.] In this memorandum, Plaintiff's counsel submitted post-hearing objections to the vocational expert's testimony. *Id*. On June 13, 2018, the ALJ, acknowledging Plaintiff counsel's post-hearing vocational testimony objections, determined that Plaintiff was not disabled. [R. 17-33.] On August 29, 2018, after a review of the ALJ's decision, the Appeals Council issued a decision affirming that Plaintiff had not been under a disability from his alleged onset date to the date of the ALJ's decision. [R. 1-3.] Thus, the Decision of the Appeals Council is the final decision of the Commissioner. Plaintiff filed an action in this court on October 15, 2018, seeking review of the Commissioner's decision.

### b.   Plaintiff's Background

Plaintiff was born in 1964 and was 50 years old on his alleged disability onset date. [R. 73.] Prior to that date, Plaintiff was a truck driver. [R. 46.] At all relevant times, Plaintiff met the classification of "mildly obese," possessing a body mass index ("BMI") of 34. [R. 373.]

Two months prior to the alleged disability onset date, on September 16, 2014, Earl Fredrick, M.D., Plaintiff's primary physician, diagnosed Plaintiff with hypertension and osteoarthritis in

relevant part.[4] [R. 540-42.] Dr. Fredrick prescribed medication to regulate Plaintiff's high blood pressure and Plaintiff's right-side pain, "radiat[ing] from the hip to the ankle." *Id.*

On November 25, 2014, ten days following Plaintiff's alleged disability onset date, Plaintiff paid another visit to his physician, at which time Dr. Fredrick further diagnosed Plaintiff with chronic kidney disease and obstructive sleep apnea ("OSA"). [R. 537.] In Plaintiff's subsequent visits on March 9, 2016, Dr. Fredrick diagnosed him with tobacco abuse disorder, followed by essential hypertension and chronic obstructive pulmonary disease ("COPD") with chronic bronchitis on November 28, 2016. [R. 506-11.] Plaintiff's tobacco abuse disorder and COPD are related to his smoking: he reported that his smoking declined from two packs a day to one. [R. 404.] Due to these conditions, Plaintiff has exhibited a minimal obstructive lung defect, which has resulted in exacerbated wheezing and coughing symptoms. [R. 405-06.]

During that time period, Dr. Fredrick also noted and attempted to treat Plaintiff's right-side lower body back pain, first appearing in the hip and leg in September 2014 and later moving to the lower back.[5] The physician prescribed Plaintiff pain medications and referred him for a lumbar spine x-ray, conducted on October 26, 2015. [R. 24, 480, 512.] The x-ray revealed Plaintiff had "[s]light L5-S1 retrolisthesis" and "mild posterior L5-S1 disc space narrowing," supporting a finding of lumbar spine degenerative disc disease. [R. 573.]

Plaintiff's pain persisted, so on September 19, 2016, pursuant to his physician's referral, Plaintiff began seeking back pain treatment with Mitchell Goldflies, M.D., an orthopedic surgeon. [R. 364.] Dr. Goldflies recorded Plaintiff's assessment of his pain as a seven on a 1-10 scale and Plaintiff's comment that "any form of activity exacerbate[d] the pain." [R. 422.] He proceeded to diagnose

---

[4]    Plaintiff's other diagnosis (erectile dysfunction) is not applicable to the Court's discussion and is thus overlooked.

[5]    Plaintiff consistently referenced right-side lower body pain. *See, e.g.,* 9/16/2014 visit [R. 540] (referencing right-side hip and leg pain); 7/10/2015 visit [R. 458] (citing "generalized back pain"); 10/26/2015 visit [R. 573] (expressing Plaintiff was experiencing "[l]ower back pain with shooting pain down right leg"); 11/27/2015 visit [R. 466] (noting Plaintiff's "persistent low back pain"); 7/18/2016 visit [R. 512] (stating "lower back pain (chronic) unrelieved by naproxen, tylenol or tramadol"); 11/28/2016 visit [R. 480] (noting "[c]urrent lower back pain").

Plaintiff with "[l]umbago with sciatica, [of the] right side," specifically finding Plaintiff's results "consistent with lumbar dysfunction with secondary right-sided sciatica" and commenting that they made him a good candidate for a "rehab program" and an MRI. [R. 367, 420.]

On September 26, 2016, at the request of the Social Security Administration ("SSA"), Plaintiff met with M.S. Patil, M.D., State consultative medical examiner. [R. 370-73.] Dr. Patil reported Plaintiff had a difficult time sitting for more than an hour and standing or walking for more than twenty minutes. *Id.* Difficulty squatting and arising were also noted. *Id.* In sum, the exam revealed Plaintiff had a slight decreased range of motion of his lumbar spine and a negative straight leg raise. [R. 372-73.]

Plaintiff then attended physical therapy on October 4, 2016, during which time an initial evaluation Plan of Care report was conducted by physical therapist Eva Szulc. [R. 587-88.] Ms. Szulc reported Plaintiff had decreased range of motion of his lumbar spine. *Id.* Specifically, he had: "1) pain in LB [(lower body)] and posterior RLE [(right lower extremity)]; 2) difficulty walking >1/2 block; 3) poor posture…; 4) decreased stance time…; 5) tender[ness] to palpation LB erector spinae, R priformis; 6) poor body mechanics; 7) decreased BLE [(Bilateral Lower Extremity)] active range of motion; 8) decreased BLE strength…; [and] 8) difficulty with stairs at times." *Id.* A treatment plan was made, but Plaintiff declined to attend future appointments, either by canceling or not showing up. [R. 580-83.]

On February 20, 2017, Plaintiff paid another visit to primary physician Dr. Fredrick's office, complaining of right-side back pain. [R. 499.] Dr. Fredrick now indicated that the "[t]he problem [had] worsen[ed]"; Plaintiff's pain, "occur[ing] persistently," "radiated to the right calf, right foot and right thigh" and was "aggravated by sitting, standing and walking." *Id.* The physician recorded Plaintiff's "chronic right-sided low back pain with right-sided sciatica," prescribed tramadol for pain management, and ordered Plaintiff's use of a "single adjustable cane." [R. 501.] Because of the

severity of the pain, Plaintiff exhibited related mental health troubles: Dr. Fredrick noted Plaintiff appeared "down, depressed or hopeless." [R. 500.]

On the same date, February 20, 2017, Plaintiff visited nephrologist Ejikeme Obasi, M.D. [R. 553-55.] Dr. Obasi diagnosed Plaintiff with stage III chronic kidney disease (moderate), rather than stage II (mild), which was Plaintiff's prior diagnosis. [R. 528, 553.] On June 2, 2017, Plaintiff had a right hip and pelvis x-ray and an ultrasound. [R. 26, 550, 562-63.] The tests revealed Plaintiff had mild degenerative joint disease of the hips and a left kidney cyst. *Id.*

No new information was reported with respect to the existing medical conditions in either the January 31, 2018 physician visit notes with Prabhakar Narayan, M.D, Plaintiff's new primary physician, or in the February 2018 hospital records, both of which supplemented Plaintiff's initial records. [R. 596-655.] While Plaintiff's January 2018 physical examination reflected the existing record, the February 2018 hospital stay raised new concerns. On February 25, 2018, Plaintiff was admitted to the emergency room as the result of a fall, seemingly occurring when Plaintiff lost consciousness. [R. 622.] Plaintiff's condition was considered "high risk," according to the intake documentation. *Id.* Plaintiff experienced a decreased visual field in the left eye, left body pain, and some left-side facial numbness. [R. 620.] Though the records do not state whether Plaintiff suffered a stroke, the brain CT found an old lacunar infarct and Plaintiff experienced paresthesia and blurred visions, all of which Plaintiff's counsel alleges may be signs he suffered from a stroke. [R. 41 (at the administrative hearing, counsel noted that "[t]wo weeks ago [Plaintiff] was hospitalized at Holy Cross for three days. He had a stroke."); 277 (Plaintiff's counsel's post-hearing memorandum mentions a "possible stroke.").] Plaintiff testified that the February 2018 hospitalization was the result of a stroke. [R. 49 ("When I had the stroke a couple weeks ago…").]

### c. The ALJ's Decision

On June 13, 2016, the ALJ denied Plaintiff's applications for DIB and SSI, based on a finding

that he was not disabled under the Act. (R. 18-35.) The opinion followed the five-step evaluation process required by Social Security Regulations. 20 C.F.R. § 404.1520. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since his alleged onset date of November 15, 2014. [R. 20.] At step two, the ALJ found Plaintiff had the severe impairments of COPD, obesity, OSA, chronic kidney disease stage III, lumbar degenerative disc disease, and bilateral hip degenerative joint disease. *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). [R. 21.] The ALJ then assessed Plaintiffs residual functional capacity ("RFC")[6] and concluded:

> [Plaintiff] has the residual function capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he cannot climb ladders, ropes or scaffolds. He can occasionally climb ramps and stairs, balance, stoop, knell, c[r]ouch, and crawl. He can occasionally push/pull and operate foot controls with the right lower extremity. He cannot work around hazards such as unprotected heights and exposed moving mechanical parts. The claimant cannot tolerate more than occasional exposure to extreme cold or extreme heat, humidity, fumes, odors, dust, gases, poor ventilation, and other pulmonary irritants.

[R. 23.] Based on this RFC, the ALJ determined at step four that Plaintiff could not perform any past relevant work. [R. 28.] Finally, at step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.* Specifically, the ALJ found Plaintiff could work as a Hand Packer (Dictionary of Occupational Titles ("DOT") # 920.687-082), Assembler (DOT # 806.687-010), and Sorter (DOT # 788.687.016).[7] [R. 30.] The ALJ relied on

---

[6]     Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue,* 539 F.3d 668,675-76 (7th Cir. 2008).

[7]     Though ALJ credited the VE's initial testimony that Plaintiff could be a Hand Packer; Assembler; or Sorter, he failed, as did the VE, to provide the full job titles that correspond to the DOT codes provided, which are Dental Floss Packer; Assembler, Bicycle II; and Scrap Sorter, respectively. [R. 30, 68.] The ALJ also ignored the VE's implications that these positions require an individual to stand independently without use of a cane, as the VE modified her answer as to the jobs appropriate for Plaintiff when confronted with the fact Plaintiff requires a cane to stand, instead citing Information Clerk

the VE testimony that each of these jobs existed in significant numbers in the national economy (*i.e.*, 470,000 hand packer positions; 566,000 assembler positions; and 102,000 sorter positions). *Id.* Because of this determination, the ALJ found that Plaintiff was not disabled under the Act. *Id.*

## II. STANDARD OF REVIEW

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over, and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id*. At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show that there are jobs that the claimant is able to perform, in which case a finding of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether

(DOT # 237.367-018), Usher (DOT # 344.667-010 and Host (349.667-010) (each also existing in significant numbers in the national economy). The ALJ ignored this correction to the VE's testimony. *Id.*

the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also* 42 U.S.C.§ 405(g).

## III. DISCUSSION

On appeal, Plaintiff asserts the ALJ made two errors. Plaintiff contends the ALJ erred by first, delivering a finding—that Plaintiff is able to perform light work and is not disabled—which is unsupported by substantial evidence; and second, by failing to adequately develop the record. Plaintiff's first point rests on two main subpoints: (a) the ALJ inappropriately relied on unsupported VE testimony (void of the requested national job number data); and (b) the ALJ improperly ignored significant medical evidence by discounting Plaintiff's pain allegations and his well-documented need for a cane. We find Plaintiffs arguments on this first point persuasive, and we remand on this issue, as detailed below. Therefore, we do not reach the second issue in as fulsome of a manner, though it is broadly discussed.

### a. The VE's Job Data Must Be Reliable

In general, the role of a vocational expert is to provide information regarding the kinds of work

and the number of jobs in the national economy a hypothetical person with certain limitations can perform. *Pagos v. Colvin,* 2015 WL 1502923, at *7 (N.D. Ill. Mar. 27, 2015); *Pelfrey v. Com'r of Soc. Sec.,* 2010 WL 909134, at *4 (S.D. Ohio Mar. 10, 2010); *see also Sample v. Schweiker,* 694 F.2d 639, 643 (9th Cir. 1982) (role of a VE is to "translate [ ] factual scenarios into realistic job market probabilities"). Typically, one of the sources a VE will rely on is the DOT. The DOT is a compendium of basic occupational information which lists occupational demands and duties, and their accompanying mental and physical requirements and skills. However, the DOT was last revised in 1991, and as to its relevance, the Seventh Circuit has stated, "not only is [the DOT] an obsolete catalog of jobs (most of the entries in it date back to 1977) but it contains no statistics regarding the number of jobs in a given job category that exist in the local, state, or national economy." *Herrmann v. Colvin,* 772 F.3d 1110,1113 (7th Cir.2014); *see also Forsythe v. Colvin,* 813 F.3d 677, 681 (7th Cir. 2016) ("[t]he vocational experts and administrative law judges can't be blamed for the poverty of the data concerning jobs that applicants for social security disability benefits are capable of performing. It is high time that the Social Security Administration turned its attention to obtaining the needed data.") (collecting cases and references). Nonetheless, the SSA relies upon the DOT as an "authoritative" publication, and its definitions are accepted as reliable evidence of how jobs are performed in the national economy. *Haddock v. Apfel,* 196 F.3d 1084, 1090 (10th Cir. 1999). A VE will also typically rely on job data from the Bureau of Labor Statistics ("BLS"). The recent trends in wages, process, and productivity in the U.S. economy come from the BLS, which is a preferred source for these figures as it contains the largest number of jobs (but does not set forth numbers based on specific DOT codes). The SSA has taken administrative notice of both the DOT and the Occupational Outlook Handbook published by the BLS. 20 C.F.R. § 416.966(d)(l)-(5).

A finding of an ALJ based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated. *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.

2007). Although a VE is entitled to rely on various methods and sources of data, the foundation for the VE's opinions must be adequate and VE's testimony must be reliable. *Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002). Although the Seventh Circuit has recognized that the standards by which an expert's reliability is measured are less stringent at an SSA administrative hearing than under the Federal Rules of Evidence, because an ALJ's findings must be supported by substantial evidence, an ALJ may depend upon expert testimony only if the testimony is adequate and reliable. *McKinnie v. Barnhart,* 368 F.3d 907, 910 (7th Cir. 2004) (referencing *Donahue,* 279 F.3d at 446).

"Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth." *Donahue,* 279 F.3d at 446. "If the basis of the vocational expert's conclusions is questioned…then the ALJ should make an inquiry…to find out whether the purported expert's conclusions are reliable." *Donahue,* 279 F.3d at 446 (italics omitted.) However, the expert's refusal to provide data supporting these conclusions, even when asked, does not categorically preclude the expert's testimony from counting as "substantial evidence" – this inquiry is on case-by-case and "takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record, [and] defers to the presiding ALJ, who has seen the hearing up close." *Biestek v. Berryhill,* 139 S.Ct. 1148, 1149 (2019).

At both the administrative hearing and in the post-hearing memorandum, Plaintiff, through his counsel, contested the reliability of the VE's conclusions as to the number of jobs identified by the VE (*i.e.*, "Dental Floss Packer," "Assembler, Bicycle II," and "Scrap Sorter") that exist in the national economy. [R. 69, 275-94.] As part of this appeal, the Commissioner attempts to persuade the Court that Plaintiff waived his objection by failing to cross-examine the VE on her methodology and by bringing his objections in a post-hearing memorandum. [Dkt. 28.] But this argument runs contrary to the record. At the administrative hearing, Plaintiff's counsel asked the VE where her numbers came from. [R. 69.] After considering her answer—that the figures came from the US Census Bureau and

US Department of Labor ("DOL"), found online through the BLS website, and that the data did not "distinguish between part-time and full-time employment,"—he then mounted a rebuttal to the information provided. [R. 69, 275-94.] Counsel's post-hearing objections to VE's testimony called upon the findings that: (1) while the VE cited the DOL/BLS as the source for the DOT Code job numbers, the DOT Code job numbers do *not* come from these sources [R. 277-294]; (2) the DOL job incidence data that is available (the Standard Occupation Classification Codes data) results from employer self-reporting on the Occupational Employment Survey and bears no correlation to the DOT Codes data provided; and (3) the VE failed to offer a reproducible methodology explaining the information she relied on, expressing only that she called upon her experience to come up with numbers for each given DOT while nonetheless conceding she could not explain the numbers' breakdown between full-time and part-time employment (the former of which matters for Plaintiff's purposes, given he was recommended for full-time work). *Id.* Counsel implicitly raised these concerns through his questions at the hearing, expressly raised them in his post-hearing brief, and further requested a supplemental hearing specifically to resolve the evidentiary and vocational inconsistencies. [R. 69-71, 275-94.]

In raising his question as to the source of the DOT codes' national job data, Plaintiff's counsel was questioning the reliability of the VE's data at hearing; just because he only later discovered the VE answered in error by ascribing the data to a source that takes no part in the DOT national job data projections, such is not to say that he failed to do what was asked of him with respect to mounting VE reliability objections at the hearing. He merely supplemented his initial objection, raised at the hearing, through his post-hearing briefs, chronicling the VE's attribution error.

As stated, the general rule is that if the basis for the VE's conclusions is questioned, this triggers an ALJ's duty to make an inquiry as to the reliability of these conclusions. *Donahue,* 279 F.3d at 446. Here, counsel requested the record be kept open for this very reason, so he could adequately review

the VE testimony against the job data available to check for inconsistencies and to see if the data raised reliability concerns. [R. 275-276.] We find, under *Donahue*, that counsel's due diligence after-the-fact still triggered the ALJ's duty to make an inquiry to find out whether the VE's conclusions are reliable, because it was directly concerning inquiries he raised during the hearing. 279 F.3d at 446.

Further, though Plaintiff's counsel clearly questioned the reliability of the job numbers provided by the VE, the ALJ failed to respond to Plaintiff's concerns with any real muster. The ALJ explained only that the VE's job numbers were reliable because: (1) the VE was qualified to give the job estimates she provided, (2) the VE relied on data from widely accepted sources, and (3) the objection was untimely. Without an inquiry into the reliability of the VE's testimony, the ALJ erroneously unquestionably accepted the VE's job numbers on her own say-so. *McKinnie*, 368, F.3d 907 at 911 (cautioning ALJs to not unquestioningly accept VE testimony without inquiring into its reliability); *see also Biestek,* 139 S.Ct. at 1160-61 (Gorsuch, J., dissenting) (witness's bare conclusions regularly held insufficient to meet substantial evidence threshold).

The ALJ failed to require the VE to provide substantiation of her hearing testimony about the number of jobs in the economy an individual with Plaintiff's RFC could perform. *Brown v. Berryhill,* 2017 WL 5473466, at *1 (N.D. Ill. 2017); *see also Donahue,* 279 F.3d at 446. In fact, the VE instead provided unreliable information, attributing the job data to the Census Bureau and DOL (which is not from), stating that it was available on the BLS website (which it is not), and failing to distinguish between full and part-time work. [R. 68-72.] Thus, the ALJ did not answer "cogently" or "thoroughly" about the positions of Dental Floss Packer, Bicycle II Assembler, and Scrap Sorter. *See Biestek,* 139 S.Ct. at 1155.

The VE's vague responses to Plaintiff's counsel were insufficient to establish a foundation for her testimony, and she did not substantiate her findings with a written report or current DOT information. *McKinnie v. Barnhart,* 368 F.3d 907, 911 (7th Cir. 2004). Of course, this substantiation

is not always necessary to the reliability of a VE's testimony, as reliability is a case-by-case assessment, but a VE's "testimony would be even better – more reliable and probative – if she had produced supporting data; that would be a best practice for the SSA and its experts." *Biestek*, 139 S. Ct. at 1155. Here, the VE's withholding of any substantiating data (especially when the VE gave DOT job numbers that included both part- and full-time work data and that were attributed to improper sources) prevents her testimony from qualifying as substantial evidence. *Id.* at 1157. In sum, even deferring to the ALJ, the Court does not believe a reasonable mind would accept the VE's evidence as adequate to support the ALJ's reliance on it, particularly without an inquiry into its reliability in light of these identified issues. *Grace v. Berryhill,* 2017 WL 1344532, at *6 (N.D. Ill. Apr. 12, 2017) (citing *Richardson*, 402 U.S. at 401; *Zuramki,* 245 F.3d at 887); *Donahue*, 279 F.3d at 446. Because of the VE's vague and uncertain responses, this case in particular warrants the ALJ to have taken a closer look at the VE's data (as Plaintiff's counsel had requested the ALJ to do) to determine whether the VE's conclusions were reliable.

In remanding on this basis, we are not holding that the VE's jobs numbers are in fact unreliable, only that in light of the unreliable VE testimony, Plaintiff has the right to see how they were derived so that she can determine whether they are subject to legitimate challenge. *See Weatherbee v. Astrue,* 649, F.3d 565, 572 (7th Cir. 2011) (in the context of a step five analysis, 1,000 of a particular job constitutes a significant number).

### b.  The ALJ Ignored Significant Medical Evidence with Respect to Plaintiff's Cane

While the ALJ's refusal to investigate the reliability of the VE's testimony, once sufficiently called into question, alone constitutes cause for remand, the ALJ's failure to account for the significant medical evidence demonstrating Plaintiff's need for a cane also requires remand in this matter. Not only does the medical record reflect Plaintiff was ordered to use a cane in February 2017 and subsequently used one, but Plaintiff also testified to this point: he explained he requires a cane to stand,

as it aids in alleviating the pressure placed on his leg, which in turn helps lessen his back and leg pain. [R. 50, 492, 604.] He further testified that without his cane, he cannot stand and must instead sit on the floor. [R. 50, 57-58.]

In rejecting Plaintiff's need for a cane while standing, the ALJ commented that Plaintiff's cane use went undiscussed in select records (pertaining to his possible stroke and thus concerning only his vision and facial paralysis, the inflictions related to that event). [R. 26-28.] But notably, the ALJ failed to point to a single record suggesting Plaintiff *could* stand without a cane at all, let alone for any meaningful period of time. *Id.* Not only did the ALJ omit any explanation in his decision as to why he thought Plaintiff could stand independently, but there appears to the Court to be a curious change in the ALJ's thinking from administrative hearing to his opinion, as the hearing transcript seemed to indicate the ALJ understood Plaintiff's need for a cane, as evidenced by the ALJ's multiple follow-up questions to the VE regarding jobs that can be done while a person stands with a cane.[8]

By rejecting the assessment of Plaintiff's medical providers that Plaintiff needed to use a cane and finding to contrary without invoking medical evidence, as well as his own prior understanding of Plaintiff's needs, the ALJ impermissibly "play[ed] doctor." *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir 1996). And, the ALJ's decision to do so does not constitute a harmless error. According to the VE's testimony, "if [a person] needed the cane for standing…then they could not perform these jobs" of Hand Packer, Assembler, or Sorter – the only three cited in the ALJ's opinion as meeting Plaintiff's RFC. [R. 30, 68.] Because the medical record and Plaintiff's testimony on the issue of the cane appear to indicate he would not be able to perform the only jobs prescribed for him by the ALJ, we must remand on this basis, as well.

---

[8]     Specifically, the ALJ inquired as to whether "those jobs [*i.e.*, Hand Packer, Assembler, and Sorter]…[would] be available if the individual needed a cane for standing." [R. 68.] When the VE answered in the negative, the ALJ further asked if there were other jobs available for individuals needing a cane for standing, in response to which the VE offered the Information Clerk, Usher, and Host positions as options. *Id.* The ALJ continued, "Are those representative examples?" *Id.* He then confirmed once more, "So the Information Clerk, the Usher and the Host wouldn't require use of both hands while standing [as to problematize holding the cane]?" [R. 69.]

## IV.  CONCLUSION

For the foregoing reasons, the Court must reverse and remand for proceedings consistent with this Memorandum Opinion and Order. At this time, the Court offers no opinion as to the other alleged bases of error in the ALJ's decision as raised by Plaintiff. Plaintiff's motion for summary judgment [dkt. 20] is granted; the Commissioner's motion for summary judgment [dkt. 27] is denied.

Entered: 11/20/2019

_____
Susan E. Cox,
United States Magistrate Judge